OPINION OF THE COURT
David O. Boehm, J.
This is an action for a judgment declaring invalid the reduction by the State Education Department of the rates charged by the plaintiffs for tuition and maintenance in connection with the care and education of handicapped children at plaintiffs’ schools in Churchville and Romulus. The *385 matter is presently before the court on a motion for summary judgment brought by the plaintiffs pursuant to CPLR 3212 and a request by the defendants for the same relief.
Article 89 of the Education Law provides for the care and education of handicapped children, as defined therein, and permits these services to be provided in nonpublic schools when appropriate, with the cost thereof to be partially paid by the State Education Department.
Pursuant to operating certificates issued by the New York State Department of Mental Hygiene which have been continuously certified and approved by the State Education Department, the Churchville school has been operating since 1959 and the Romulus school since 1973.
Bar-D Leasing Incorporated, the stock to which is held by the Dubendorfs and their adult children, holds title to the real and tangible personal property of the schools.
In 1976, the plaintiffs and the State Education Department entered into a contract whereby the State Education Department obligated itself to pay to the plaintiffs an agreed upon tuition rate and maintenance charge as approved by the Commissioner of Education and the Director of the Budget. This agreement remained in effect until terminated by the State Education Department on July 28, 1978.
When the contract was entered into on October 15, 1976, the plaintiffs established for the school year 1976-1977 a per pupil charge for tuition of $8,500 and a per pupil charge for maintenance of $4,500. One month later the plaintiffs received a notice from the State Education Department advising that the same amounts were an "interim” approved rate, and payments were thereafter made accordingly, totaling $66,000. However, additional established maintenance charges of $1,-300 per month for the two summer months in that school year were not paid, although similarly approved.
Defendant, Howard Miller, as the Acting Director of the Division of the Budget of New York State, is charged under article 89 with the duty of reviewing and approving the tuition charges and maintenance expenses established by the State Education Department.
Under separate agreements with various counties and school districts, the plaintiffs also provided education and care for other handicapped children. These counties and school districts paid plaintiffs on a monthly basis pursuant to *386 amounts directly negotiated and were then partially reimbursed by the State Education Department.
As the result of an audit conducted by the office of the State Comptroller, Division of Audits and Accounts, the State Education Department informed the plaintiffs on January 25, 1978, that they were liable for overpayments for the 1976-1977 school year in the amount of $15,378 and that this amount was to be offset against the 1977-1978 school year payments. The audit resulted in retroactively decreasing the tuition rate from $8,500 to $4,600 and increasing the maintenance rate from $4,500 to $5,900.
An examination of the audit report discloses that the reduction in the tuition rate was made because it was concluded that plaintiffs had charged tuition rates "substantially in excess of actual costs or costs which we determined to be reasonable * * *. A major portion of the disallowance * * * resulted from a non-arms-length lease agreement which was negotiated by the operators and a related corporation.” The report also disallowed most of the salary increases which the plaintiffs had budgeted for themselves in the next fiscal year.
In response to a request for comment from the Division of Audits and Accounts following a draft audit in February, 1977, the plaintiffs explained that their rental cost was based upon a property appraisal valuing the facilities at $400,000 and that the fair rental value should be based upon fair market value rather than the original purchase price of the properties. In addition, they justified the salaries requested on the basis of their education, experience and the number of hours they devoted to the schools.
Nevertheless, the Division of Audits and Accounts relied upon net book value of the real and personal property, applying "the same standards as were used by the State Health Department in determining fair rentals for nursing homes in comparable situations * * * because this measure [net book value] is a generally accepted accounting standard.” As to administrative salaries, the report limited them to cost-of-living increases of 7.2% rather than the 50% increase requested.
After receiving notice in January, 1978, that the State Education Department had adopted the findings of the audit report, the plaintiffs in a February 9, 1978 letter to the Commissioner of Education requested a formal hearing. A month later they were instructed in a letter from the State *387 Education Department to direct any protest to the Department of Audit and Control. Although not specifically so stated, this may be construed as a denial of the plaintiffs’ request for a hearing.
The plaintiffs correctly argue that the decision to adopt the findings of the Division of Audits and Accounts by the State Education Department constituted a final determination by it which operated to exhaust plaintiffs’ administrative remedies. In addition, the retroactive action effectively denied the plaintiffs even the meager administrative relief provided by 8 NYCRR 200.13(a) which permits an application to be made to the Commissioner of Education for rate adjustments no later than the first day of April preceding the school year for which the adjustment is sought.
After commencing this action for a declaratory judgment, the plaintiffs on April 6, 1978 obtained a preliminary injunction compelling the defendants, pending trial, to continue paying the plaintiffs at the original rate of $8,500 for tuition and $4,500 for maintenance and prohibiting defendants from recouping the difference between those rates and the ones established in the audit report. That order is still in effect.
In this motion for summary judgment the plaintiffs request the relief demanded in their complaint, including a permanent injunction with respect to what is now temporarily enjoined: that those provisions of article 89 of the Education Law which delegate to the Commissioner of Education the power without statutory guidelines to determine tuition and maintenance rates be declared unconstitutional; that the tuition and maintenance rates for the 1976-1977 school year as determined by the commissioner, being without statutory authorization, be declared null and void; that the determination of the defendants with respect to the findings contained in the audit report be declared to be arbitrary, in disregard and in excess of statutory authority, unconstitutional, unreasonable, etc., and null and void; and that a hearing in accordance with due process requirements be directed before an impartial person to establish the proper rates.
Preliminarily, defendants have raised an issue as to the nature of the present action. Contrary to their assertion, the law is now too well settled for there to be any remaining doubt that a declaratory judgment action is the proper procedure by which to review a determination of an administrative agency fixing rates (Matter of Broadacres Skilled Nursing *388 Facility v Ingraham, 51 AD2d 243, 245; Matter of Park Crescent Nursing Home v Whalen, 55 AD2d 801, app dsmd 42 NY2d 975; see, also, Matter of Lakeland Water Dist. v Onondaga County Water Auth., 24 NY2d 400). Accordingly, defendants’ application to dismiss on this ground is denied.
As another procedural defense defendants assert that the Board of Regents is a necessary party to the present action. While it is true that section 207 of the Education Law requires that the Regents approve all rules and regulations of the Commissioner of Education before they can become effective, all that is requested of this court is to pass on the validity of the present regulations. Furthermore, there is no claim that the Board of Regents played a substantial role in any of the matters at issue or that they will be adversely affected by this court’s determination (Matter of Jerry v Board of Educ., 44 AD2d 198, 205, mod on other grounds 35 NY2d 534). Thus, the defense is without merit.
Plaintiffs’ constitutional attack upon article 89 is grounded upon their claim that the Legislature has not provided sufficiently specific guidelines with respect to establishment of rates for tuition or maintenance expense.
The New York Constitution provides that "[t]he legislative power of this State shall be vested in the Senate and Assembly.” (NY Const, art III, § 1.) Nevertheless, the Legislature may delegate to administrative agencies the authority to formulate and adopt rules and regulations which will effectuate the provisions and purposes of a statute (see, e.g., Matter of City of Utica v Water Pollution Control Bd., 5 NY2d 164), and this includes delegation of the authority to set rates (Noyes v Erie & Wyoming Farmers Co-op. Corp., 281 NY 187).
However, legislation conferring such discretionary power to administrative agencies must contain proper standards and safeguards. In setting forth the kind of standards that are required, the Court of Appeals stated: "The Legislature may constitutionally confer discretion upon an administrative agency only if it limits the field in which that discretion is to operate and provides standards to govern its exercise. This does not mean, however, that a precise or specific formula must be furnished in a field where flexibility and the adaptation of the legislative policy to infinitely varying conditions constitute the essence of the program. The standards or guides need only be prescribed in so detailed a fashion as is reasonably practicable in the light of the complexities of the particu *389 lar area to be regulated, since necessity fixes a point beyond which it is unreasonable and impracticable to compel the Legislature to prescribe detailed rules * * *. Indeed, in many cases, the Legislature has no alternative but to enact statutes in broad outline, leaving to administrative officials enforcing them the duty of arranging the details”. (Matter of Levine v Whalen, 39 NY2d 510, 515 [citations omitted], modfg 50 AD2d 503; see, also, Matter of Nicholas v Kahn, 62 AD2d 302, 306.)
Turning to the pertinent sections in article 89, we find that in subdivision 3 of section 4401 "maintenance expense” is simply defined as the "dollar amount charged for room and board and allocable debt service as determined by the commissioner for the living unit of the residential facility” plus certain reasonable medical expenses (emphasis supplied). The same subdivision requires that the dollar amount "shall be approved by the commi&sioner of education and the director of the division of the budget and shall not be otherwise payable or reimbursable.” Subdivision 5 of the same section defines "tuition” as the "per pupil cost of all instructional services, supplies and equipment, the operation of instructional facilities and allocable debt service for the instructional facilities, as determined by the commissioner. ” (Emphasis supplied.)
Subdivision 5 of section 4403 permits the commissioner to require financial information "as may be necessary from and to audit any public or non-public school receiving any public moneys pursuant to any provision of the education law as the commissioner deems appropriate.” (Emphasis supplied.) However, an examination of the Education Law discloses that the only other provisions dealing with audits are found in section 2116-a which deals exclusively with public schools.
Section 4405 (subd 1, par b) provides that the maintenance expense of each child be paid in accordance with regulations promulgated by the commissioner, and paragraph d of subdivision 3 requires the commissioner annually to "determine the allowable tuition rate for each private school * * * pursuant to his rules and regulations.” [Emphasis supplied.) It then states: "Such allowable tuition rate shall be the maximum amount which a private school may charge for the instruction of a pupil for whom a school district has contracted with such school. These rates shall not become effective until approved by the director of the budget.”
It would seem at first blush that the Legislature has set forth imprecise and inexact standards for the Commissioner of *390 Education or the State Education Department to follow. The guidelines are general and nonspecific and in most instances the criteria for setting rates seem to be subject to the broad and largely undirected discretion of the commissioner.
However, it must be kept in mind that conditions for residential educational facilities, such as plaintiffs’, vary throughout New York State. The educational needs of handicapped children and the techniques utilized are in constant change and expansion. Thus, the complexities of this area of legislation, like that upheld in Matter of Levine v Whalen (39 NY2d 510, supra) require fairly broad and necessarily imprecise statutory standards which will enable the State Education Department to carry out its statutory responsibility and the beneficial purpose of educating handicapped children.
The Legislature has set forth in article 89 its policy and declared its legislative purpose, as follows: "The Legislature finds that the existing methods of securing and financing educational programs for handicapped children are unduly complex and administratively burdensome. To this end the following streamlined system for providing these services is enacted.” (L 1976, ch 853, § 1.)
Section 4403 then goes on, in subdivisions 2 and 3, to require the State Education Department "[t]o stimulate all private and public efforts designed to relieve, care for or educate handicapped children and * * * [t]o formulate such rules and regulations * * * as the commissioner of education shall deem to be in their best interests” to provide for their physical and educational needs.
The other provisions in article 89 are intended to develop and implement this policy. Although somewhat general, they are nevertheless sufficiently precise to carry out the intended purpose as the Legislature has declared it.
It has been held that if the Legislature’s direction and intent may be ascertained, even from broad statements, which generally delineate the ideals and purposes of the legislative policy, this is sufficient to pass constitutional muster (Matter of Levine v Whalen, 39 NY2d 510, 516-517, supra; Matter of Sigety v Ingraham, 29 NY2d 110, 114). For a comprehensive legal and historical discussion of the subject, see then Chief Judge Cullen’s scholarly opinion in Matter of Trustees of Vil. of Saratoga Springs v Saratoga Gas, Elec. Light & Power Co. (191 NY 123), in which the Court of Appeals upheld the *391 granting by the Legislature to an administrative commission the authority to fix maximum gas and electric rates.
Even were there doubt as to the sufficiency of the legislative standards, it would not be sufficient in this case to warrant a determination of unconstitutionality. As defendants correctly argue, a strong presumption of constitutionality attaches to all legislation, and the invalidity of any statute in question must be clearly, convincingly and conclusively shown (8 NY Jur, Constitutional Law, §§ 59, 64, 79, 80 and cases cited therein). Thus, the Court of Appeals has stated that "legislative enactments [are] supported by a presumption of validity so strong as to demand of those who attack them a demonstration of invalidity beyond a reasonable doubt, and the courts strike them down only as a last unavoidable result” (Matter of Van Berkel v Power, 16 NY2d 37, 40). Indeed, even if the validity of the legislative enactment is " 'fairly debatable’ * * * 'the legislative judgment must be allowed to control’ ” (Levitt v Incorporated Vil. of Sands Point, 6 NY2d 269, 273).
Applying these standards, it is manifest that the plaintiffs have failed to meet the burden of demonstrating a constitutional infirmity. Accordingly, it is determined that the delegation of rate-making authority to the defendants in the manner provided by article 89 of the Education Law is constitutionally sufficient and the plaintiffs’ motion for summary judgment on this ground is denied.
However, even if the legislation meets the necessary constitutional requirements, plaintiffs next argue, the tuition and maintenance rates are nevertheless invalid because the commissioner has failed to promulgate standards and regulations by which such rates may be properly determined on a consistent and predictable basis instead of in the ad hoc manner by which they were established here.[1]
This argument has much force. Because the statutory guidelines are not detailed, it becomes even more imperative for the commissioner to provide standards and rules with sufficient precision so that those who are regulated by them will have a *392 clear understanding of how to operate safely and securely within them.
Section 4405 (subd 3, par d) of the Education Law requires the Commissioner of Education to annually determine the allowable tuition rate "pursuant to his rules and regulations.” However, the only regulations dealing with tuition and maintenance rates are found at 8 NYCRR 200.11 and 200.13, and they provide no fixed or objective criteria by which such rates are to be calculated.
For example, section 200.13 of the regulations provides that the amount which may be charged "shall be determined in accordance with the provisions of section 4401 of the Education Law and this section.”
Section 4401 is a definitional section which defines "maintenance expense” and "tuition”. As already noted, there are certain items included in these definitions such as "allocable debt service” and "the cost of all instructional services, supplies and equipment” but here again we are met with general configurations all subject to determination by the commissioner.
Thus it would seem that the commissioner has not complied with the legislative mandate directing and empowering him to promulgate the necessary rules and regulations pertaining to tuition and maintenance rates. At best the regulations are vague and general without the required particularity which would place some limitation upon what otherwise appears to be an unfettered discretion.
The contract entered into between plaintiffs and the State Education Department does not furnish much guidance either. Paragraph 2 provides only that the State will pay "the agreed upon tuition rate approved by the Commissioner of Education and approved by the Director of the New York State Division of the Budget”, and paragraph 5 tells us that the "charge for maintenance may not exceed the amount approved for such purpose by the Commissioner of Education and the Director of the Budget of the State of New York.”
In the absence of the necessary guidelines, the Department of Audit and Control fell back upon the New York State Health Department standards to determine the permissible real and personal property rental allowances.[2]
*393 Indeed, the Department of Education has itself admitted that it does not function under uniform objectives and standards. For example, in its communication of March 9, 1977 to Audit and Control commenting on the draft audit, Gordon Ambach of the State Education Department stated that he desired further details concerning the methods used in arriving at the disallowance, so that the department would be consistent in future field examinations. Additionally, in an internal memorandum of January 19, 1978, the State Education Department, in response to a recommendation that the department adopt standards as to the number and salaries of administrative staff, noted that no action was required because standards were already incorporated in a document entitled "Standards for Activities Reimbursable for State Aid Purposes”.
The defendants, although not conceding the absence of the necessary regulations, have called attention to a memorandum of agreement entered into July, 1977 between the State Education Department, Department of Audit and Control, Department of Social Services, Department of Mental Hygiene, Board of Social Welfare and Division of the Budget.
The stated purpose of the agreement is "to adopt a coordinated plan of state oversight” of private institutions for handicapped children. The agreement then sets forth "a common set of standards to be used in establishing tuition rates and maintenance rates for conducting field audit examinations”, including uniform standards for allowable administration and leasing and rental costs.
Although this agreement would not, by virtue of its July, 1977 date, be applicable to the 1976-1977 school year, it would apply to the 1977-1978 school year.
Plaintiffs argue that the agreement is invalid because its provisions were not promulgated and filed in the manner prescribed by the State Constitution, Executive Law and the new State Administrative Procedure Act. On oral argument, defendants responded that those requirements were unnecessary because the agreement is only an internal document setting forth certain guidelines for these agencies.
Plaintiffs’ attack upon this agreement, although its provi *394 sions would have prospective effect only upon the 1977-1978 audit, is not premature since it involves a question of law as to the validity of an existing regulation. Furthermore, plaintiffs would seem to have standing because of the effect which the defendants now claim the agreement has upon the manner in which certain rights and obligations between the parties will be resolved (.Kalman v Shubert, 270 NY 375, semble; see, also, New York Foreign Trade Zone Operators v State Liq. Auth., 285 NY 272; cf. State Administrative Procedure Act, § 205).
In order for rules and regulations to be valid, they must be promulgated according to certain well-defined procedures (Executive Law, § 101-a; see, also, State Administrative Procedure Act, § 202) and then filed with the Secretary of State (NY Const, art IV, § 8; Executive Law, § 102; see, also, State Administrative Procedure Act, § 203).
As to the meaning of "rule” for the purpose of these requirements, section 101-a (subd 1, par b) of the Executive Law, defines it as "the whole or part of each agency statement of general applicability or regulation or code that implements or applies law, or prescribes the procedure or practice requirements of any agency”. The word is similarly defined in section 102 (subd 2, par [a]) of the State Administrative Procedure Act.
The only category of rule which is excluded from these requirements is a rule which "relates to the organization or internal management of the agency.” (Executive Law, § 101-a, subd 1, par b; see, also, NY Const, art IV, § 8; Executive Law, § 102, subd 2; State Administrative Procedure Act, § 102, subd 2, par [b], cl [i].)
While it may be that memoranda concerning a State agency’s own internal auditing procedures and instructions are not rules within the meaning of the State Constitution, the Executive Law, and the State Administrative Procedure Act (Matter of Gaslight Club v Catherwood, 30 AD2d 904), an examination of the agreement demonstrates that it clearly falls within the species which requires promulgation and filing.
The agreement is a statement of "general applicability” which "prescribes the procedure or practice requirements” of an agency. The fact that it is termed a memorandum of agreement instead of a rule or regulation is of no consequence. As then Judge Fuld observed: "The term, 'rule or regulation’, *395 has not, it is true, been the subject or precise definition, but there can be little doubt that, as employed in the constitutional provision, it embraces any kind of legislative or quasi-legislative norm or prescription which establishes a pattern or course of conduct for the future. The label or name employed is not important and, unquestionably, many so-called 'orders’ come within the term.” (People v Cull, 10 NY2d 123, 126; see, also, Matter of Swalbach v State Liq. Auth., 7 NY2d 518, 526-527; Matter of Sturman v Ingraham, 52 AD2d 882, 884-885; Yaretsky v Blum, 456 F Supp 653, 655.)
Additionally, the Department of Audit and Control, in its final audit of plaintiffs’ operations, recommended that the State Education Department establish proper standards and procedures for setting tuition and maintenance rates. The State Education Department, in response to this suggestion, stated in an internal memorandum that it did not have to adopt such standards because of the existence of the memorandum of agreement. The State Education Department thereby admitted that the memorandum of agreement has general applicability and is intended to function as if it were a regulation.
It is clear, therefore, that the memorandum of agreement was not promulgated and filed as required by law, and, accordingly, has no legal validity or effect as a rule or regulation.
Although the absence of the required regulations would appear to be not only a failure to carry out the commissioner’s duties in a responsible manner but also a violation of the Legislature’s mandate, nevertheless, that absence does not require the result which the plaintiffs urge, i.e., prohibiting the recouping of claimed overpayments. Section 4401 of the Education Law clearly gives the commissioner the power to approve maintenance expense and determine tuition cost, with or without regulations.
However, plaintiffs further argue, the rates were not adopted in a timely manner nor were they approved by the Director of the Budget, as required. Although unnecessary delay in settling final rates may impose a financial inconvenience that may, as here, amount to economic hardship, nevertheless, article 89 of the Education Law does not set any time limitations for either determining final rates or obtaining approval.
Further, the Commissioner of Education and the Director of the Budget acted entirely lawfully in relying upon the report *396 of the Comptroller and the audit by his Department of Audit and Control (NY Const, art V, § 4; Executive Law, § 40, subd 1). Indeed, under the State Constitution, the payment of any State money "except upon audit by the comptroller, shall be void” (NY Const, art V, § 1; see, also, State Finance Law, §§ 8, 111). As the Court of Appeals recently stated: "[Ljanguage imposing the requirement of a comptroller’s audit creates a precondition to the right to receive payment * * * is most consequential * * * [A] claimant’s cause of action does not accrue until it possesses the legal right to be paid and to enforce its right to payment in court. It follows that where, by contract or by statute, the State’s obligation to pay is conditioned upon an audit, no suit can be brought by a claimant until the official charged with making the audit has done so and has formally rejected all or some part of the claim.” (City of New York v State of New York, 40 NY2d 659, 668 [citations omitted].)
Furthermore, the duty to conduct such audits is not a duty owed to plaintiffs but rather is one that is owed to the State. Thus, plaintiffs may not benefit from any alleged failure to comply with these obligations (cf. Westgate North v Boyer, 47 AD2d 970, mot for lv to app den 36 NY2d 647).
Until made final, all rates are provisional, being based upon projected cost estimates submitted by plaintiffs for the subsequent school year (cf. Matter of L. v New York State Dept, of Educ., 39 NY2d 434, 439; Matter of Smith v Levitt, 30 NY2d 934). Thus, plaintiffs have no final and vested ownership in the sums authorized or received. What they do have, however, is a substantial property right and this will be taken up hereinafter.
The agreement between the parties also provides that the tuition and maintenance rates are the sums approved by the Commissioner of Education and approved by the Director of the Budget. By the agreement, the plaintiffs acknowledged that their accounts were subject to audit by the Department of Education and the Department of Audit and Control, and that "[a]ny overpayments will be reimbursed by the contractor to the State.”
Accordingly, the plaintiffs’ application for summary judgment on these grounds is also denied.
Plaintiffs contend that at the very least they are entitled to a hearing because minimum considerations of procedural due process require it, even in the absence of express statu *397 tory or regulatory requirements.[3] The agreement between the parties does not itself provide a hearing procedure.
While this question has apparently not yet been reached under article 89 of the Education Law, it has been decided with respect to recoupment of overpayments to medical and residential health care facilities. In those cases, the Court of Appeals has, as a matter of due process, required a hearing with respect to the audit which determined as overpayment interim rates already received, providing, however, that a hearing is not required prior to recoupment (Matter of White Plains Nursing Home v Whalen, 42 NY2d 838, 840, cert den 434 US 1066; Clove Lakes Nursing Home v Whalen, 45 NY2d 873; see, also, Hurlbut v Whalen, 58 AD2d 311, 316, n 6, mot for lv to app den 43 NY2d 643; Matter of Bradley v Whalen, 58 AD2d 664, 665; Matter of Park Crescent Nursing Home v Whalen, 55 AD2d 801, 802, app dsmd 42 NY2d 975; Matter of Birnbaum v Whalen, 85 Misc 2d 512, 515).[4]
For example, in a somewhat analogous situation, the Court of Appeals in Matter of White Plains Nursing Home v Whalen (supra), affirmed the granting of a hearing to contest the Commissioner of Health’s reduction of petitioner’s Medicaid reimbursement rate and the State’s claim for recoupment which was based upon the commissioner’s determination that the lease between the petitioner and the landlord was not an arm’s length transaction.
Similar property interests are at stake in the present case because the Department of Education is attempting to recoup overpayments already made (see Gabrielli and Nonna, Judicial Review of Administrative Action in New York: An Overview and Survey, 52 St John’s L Rev 361). Accordingly, the plaintiffs are entitled to a hearing with respect to the 1976-1977 tuition and maintenance rates.
While it is not the function of this court to specify the exact details of the hearing, several comments on the parameters *398 are appropriate. First, the hearing should be promptly held. Furthermore, as the Court of Appeals has recently stated, "the procedures [should] be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,’ [citation omitted] to insure that they are given a meaningful opportunity to present their case” (Clove Lakes Nursing Home v Whalen, 45 NY2d 873, 875, supra, quoting from Mathews v Eldridge, 424 US 319, 349; see, also, Matter of 1133 Ave. of Americas Corp. v Public Serv. Comm, of State of N. Y., 62 AD2d 787, 788). As to the procedure to be followed, fortunately the State Administrative Procedure Act provides meaningful guidelines (see, e.g., State Administrative Procedure Act, § 301).
Turning to the 1977-1978 tuition and maintenance rates, the questions raised by plaintiffs relating to the validity of these rates are prospective in nature. There are existing factual issues relating to plaintiffs’ operation. No audit has been conducted and no final rates have been set. As the Fourth Department recently held: "On this issue it appears that there are factual questions relating to plaintiff’s operating costs and the formulae to be used in computing prospective reimbursement rates. Since the administrative agency is best suited to resolve these factual questions and since plaintiff has no property right in prospective reimbursement payments * * * recourse to the courts, prior to exhaustion of administrative remedies, is unwarranted.” (Hurlbut v Whalen, 58 AD2d 311, 317-318, supra; see, also, Matter of Sisters of Charity Hosp. of Buffalo v Whalen, 64 AD2d 858.)
It is a fundamental principle of law that "[s]ince the initial function of establishing rates is a legislative one, a hearing is not a prerequisite unless the Legislature so directs” (Matter of Kew Gardens Sanitarium v Whalen, 55 AD2d 226, 228, affd 43 NY2d 675; see, also, State Administrative Procedure Act, § 202, subd 1; Gifford, The New York State Administrative Procedure Act: Some Reflections Upon Its Structure and Legislative History, 26 Buffalo L Rev 589, 611-613). Stated differently, due process does not require a hearing for prospective rates in the absence of such a requirement by statute or regulation (Matter of White Plains Nursing Home v Whalen, 42 NY2d 838, 840, cert den 434 US 1066, supra).
However, in view of the fact that a hearing has been ordered with respect to the 1976-1977 rates, the same hearing should also inquire into and determine the factual questions *399 which will affect the prospective rates as well. These questions involve the appropriate measure by which to establish the correct formula for determining rent, the nature of the relationship between the plaintiffs and their landlord, by what percentage plaintiffs’ salaries should be increased and any other matters of existing disagreement between the parties. Such a hearing will provide an adequate record for review (Matter of White Plains Nursing Home v Whalen, 53 AD2d 926, affd 42 NY2d 838, cert den 434 US 1066, supra; Gabrielli and Nonna, Judicial Review of Administrative Action in New York: An Overview and Survey, 52 St John’s L Rev 361, 379-380).
Until such a hearing has been held and a determination made, it would be premature to decide whether the conduct of the State Education Commissioner in retroactively reducing the rates was arbitrary and capricious. Indeed, there is considerable question as to whether that test or "the substantial evidence test” is applicable (Gabrielli and Nonna, Judicial Review of Administrative Action in New York: An Overview and Survey, 52 St John’s L Rev 361, 370-372, 380).

. Although the Department of Audit and Control has promulgated general regulations with regard to field audits for all State departments and agencies, and also private institutions whose funds are payable by the State, none of these regulations relate to or in any manner control the questions raised by plaintiffs (2 NYCRR Part 16).

. An examination of Subpart 86-2 of the Department of Health Rules and Regulations (10 NYCRR Subpart 86-2) pertaining to residential health care facilities *393 reveals the precise and specific provisions available to the Department of Audit and Control in conducting its audit.

. It should be noted that plaintiffs do not have standing to utilize the general hearing provisions before the Commissioner of Education under section 310 of the Education Law because their claims are not the type addressable under that section.
Additionally, although the statute and regulations do not provide schools with due process rights, they do provide extensive rights and procedures for parents and children (see, e.g., Education Law, § 4404; 8 NYCRR 200.5).

. As a result of these decisions, the Department of Health now has regulations establishing elaborate hearing procedures for medical and residential health care facilities (10 NYCRR 86-1.8, 86-2.7).