Melanie STANGER et al., Plaintiffs,

v.

Gordon AMBACH et al., and Behavior Research Institute, Inc., Defendants.

BEHAVIOR RESEARCH INSTITUTE, INC., Defendant and Third–Party Plaintiff,

v.

Howard F. MILLER, as Director of the Budget of the State of New York, Third–Party Defendant.

No. 79 Civ. 0859 (CLB).

United States District Court, S. D. New York.

Dec. 2, 1980.

Charles G. Davis of Dubbs, Leopold, Davis & DePodwin, New City, N. Y., for Stanger et al.

Robert E. Ganz of O'Connell & Aronowitz, P. C., Albany, N. Y., for BRI, defendant and third–party plaintiff.

Jean Coon of State Department of Education, Albany, N. Y., for Ambach.

Barbara Butler, Asst. Atty. Gen., Albany, N. Y., for Miller.

## MEMORANDUM DECISION

BRIEANT, District Judge.

Defendant and third–party plaintiff Behavior Research Institute, Inc. ("BRI") has presented a motion, which has been joined in by the plaintiffs, for a preliminary injunction (1) enjoining defendant Gordon Ambach, Commissioner of the State Education Department, and the third–party defendant Howard F. Miller, Director of the Budget of the State of New York, from using the "Standards for Activities Reimbursable for State Aid Purposes" (the "Standards") in the setting of tuition and maintenance rates for BRI, (2) enjoining third–party defendant Miller from disapproving for inclusion in BRI's tuition rate, on educationally related grounds, staff positions initially approved by the State Department of Education, and (3) enjoining defendant Ambach and third–party defendant Miller from reducing the tuition and maintenance rates of BRI to a level below that necessary to comply with New York State's minimum staffing requirements.

BRI has asked also that this Court declare that defendant Ambach and third–party defendant Miller have wrongfully refused to reimburse BRI for $97,548.12 of tuition and maintenance rates for the school years 1976–77, 1977–78, 1978–79, and 1979–1980.

Other claims by BRI in its third–party complaint have not been pursued in their briefs by either BRI or the plaintiffs, and will not be addressed by the Court.

Third–party defendant Miller has moved to dismiss the third–party complaint of BRI on the grounds that certain portions of the complaint are barred by the Eleventh Amendment to the United States Constitution, that BRI lacks standing to raise claims based on an alleged failure to provide appropriate education to plaintiffs, and that this Court should abstain from exercising jurisdiction over BRI's claims. Plaintiffs also moved orally that third–party defendant Miller be joined as necessary defendant in the main action.

BRI is a private residential school for severely handicapped children, located in Providence, Rhode Island. It specializes in the care and training of severely autistic children. In 1967–77 New York students began to be placed there by local school districts with the approval of the New York State Education Department, pursuant to the Federal Education for All Handicapped Children Act, 20 U.S.C. § 1401 *et seq.*, and the newly enacted Article 89 of the New York Education Law.

By late 1978, BRI served approximately thirteen New York students. Financial disputes and disputes over the training program between BRI and state officials led the State Education Department to initiate a change of placement for the New York

students at BRI to a public New York state facility. Plaintiffs, who are severely autistic children in attendance at BRI, commenced this action by their parents to enjoin their transfer from BRI, claiming that they were being denied their statutory right to a hearing prior to the transfer, and that the transfers would be inequitable, unfair, and severely detrimental to the progress of the children, in part because of the disruptive effect of any sudden change.

On February 15, 1979, this Court temporarily restrained the State Education Department from withdrawing funding for plaintiffs at BRI. Upon consent of the parties, the temporary restraining order was converted into a preliminary injunction on February 20, 1979, which continues to be in effect.

In June 1980, BRI was informed that it was continued as an approved school for placement for 1980–81. Since then, the difficulties between the state defendants and BRI have revolved around their inability to agree upon a budget for BRI for the 1980–81 school year.

On July 16, 1980 BRI was granted leave to implead third–party defendant Miller in the action and to file a third–party complaint. Jurisdiction in this Court is founded on 28 U.S.C. §§ 1331(a), 2201 and 2202. A hearing on BRI's application for a preliminary injunction was heard before the Court on September 25, 1980; BRI, plaintiff children and third–party defendant Miller have submitted briefs and supplemental briefs. The facts underlying this motion are not in dispute.

■ At the outset, the Court will address third–party defendant Miller's motion to dismiss. The Court finds it unnecessary to consider whether or not BRI has standing to raise the claims pleaded in its third–party complaint, because plaintiffs have requested and have been granted leave to join in BRI's motion. Plaintiffs clearly have standing to challenge the procedures involved in the determination of BRI's budget, as that budget determination is a "matter relating to ... the provision of a free appropriate public education ..." for them.

See U.S.C. §§ 1415(b)(1)(E) to (e)(4); *Concerned Parents & Citizens for the Continuing Education at Malcolm X. v. The New York City Board of Education*, 629 F.2d 751 (2d Cir., 1980). *See also* New York Education Law §§ 4401(3), 4401(5) and 4405(3)(d); *Dubendorf v. New York State Education Department*, 97 Misc. 382, 412 N.Y.S.2d 260, 268 (Sup.Ct.Monroe Co.1978).

■ Third–party defendant Miller also argues that even if plaintiffs have standing they may not proceed with this motion because they have failed to exhaust their administrative remedies, as required by 20 U.S.C. §§ 1415(b)(2) to (e). Plaintiffs are not required, however, to exhaust their administrative remedies if to do so would not in any way further the purposes behind the exhaustion doctrine. *See McKart v. United States*, 395 U.S. 185, 193–94, 89 S.Ct. 1657, 1662–1663, 23 L.Ed.2d 194 (1969); *Diapulse Corporation of America v. Food & Drug Administration*, 500 F.2d 75, 77–78 (2d Cir. 1974). No administrative process is pending that will be or has been prematurely interrupted by this action. In addition, Education has already recommended and Budget has approved a budget, and both departments have decided that the challenged "Standards" should be used in their formulation of the budget for BRI. *See* 395 U.S. at 193–94, 89 S.Ct. at 1662–1663; 500 F.2d at 77–78.

■ This Court in its discretion also declines to abstain. Abstention is "the exception, not the rule," and is inappropriate here. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813–16, 96 S.Ct. 1236, 1244–1245, 47 L.Ed.2d 483 (1976). BRI's third–party complaint alleges violations of federal and state statutes, which a United States district court appropriately may address. Further, federal jurisdiction is not being invoked here to restrain state criminal or quasi–criminal proceedings, state nuisance proceedings, or state tax collection. *See id.*

Third–party defendant Miller has also argued that the Eleventh Amendment bars BRI's request for a declaration that Educa-

tion and Budget wrongfully withheld monies from BRI for prior school years.

Since this third–party complaint was filed, the State has voluntarily paid BRI more than $67,000 of the $97,548.12 claimed. While approximately $30,000 of the claimed money is still in dispute, BRI has represented that future events "may obviate the need for any judicial resolution of this issue" and has requested that the Court "defer ruling on the matter." Therefore, this Court will defer consideration of this claim at this time.

Before addressing the merits of the balance of BRI's motion, it may be helpful to describe briefly the procedure for setting tuition and maintenance rates in New York, and to relate the progress of the parties to date in following those procedures.

New York Education Law contains the following definitions in § 4401:

3. "Maintenance expense." For purposes of this article "maintenance expense" shall mean the dollar amount charged for room and board and allocable debt service *as determined by the commissioner* for the living unit of the residential facility by a residential school and such reasonable medical expenses actually and necessarily incurred by a handicapped child while actually in attendance at a residential school, provided that such medical expenses shall be for diagnostic, evaluative, educationally related, and emergency care services *as defined by regulations of the commissioner.* Such dollar amount, which shall not include expenses which are otherwise reimbursable to a residential facility by federal, state or local agency, *shall be approved by the commissioner of education and the director of the division of the budget* and shall not be otherwise payable or reimbursable.

    *    *    *    *    *    *

5. "Tuition" shall mean the per pupil cost of all instructional services, supplies and equipment, the operation of instructional facilities and allocable debt service for the instructional facilities, *as determined by the commissioner.* Approved

tuition shall be computed from expenditures from which no revenue has been received from the following sources:

(a) receipts from the federal government;

(b) any cash receipts which reduce the cost of an item applied against the item therefor, except gifts, donations and earned interest, and

(c) any refunds made or any apportionment or payment received from the state for experimental or special programs *as approved by the commissioner.* (emphasis supplied)

In addition, § 4405(3)(d) reads:

(d) The *commissioner of education shall, annually, determine the allowable tuition rate* for each private school for the purposes of this subdivision *pursuant to his rules and regulations.* Such allowable tuition rate shall be the maximum amount which a private school may charge for the instruction of a pupil for whom a school district has contracted with high school. *These rates shall not become effective until approval by the director of the budget.* (emphasis supplied)

Section 4407(1) reads:

1. When it shall appear to the satisfaction of the department that a handicapped child, who, in the judgment of the department can reasonably be expected to benefit from instruction, is not receiving such instruction because there is no appropriate public or private facilities for instruction of such a child within this state because of the unusual type of the handicap or combination of handicaps as certified by the commissioner, *the department is authorized to contract with an educational facility located outside the state*, which, in the judgment of the department, can meet the needs of such child, for instruction of such child in such educational facility, and the department is further authorized to expend for such purpose a sum not exceeding the allowable tuition charges per eligible pupil at

such educational facilities *as determined by the commissioner of education and approved by the director of the budget.* (emphasis supplied)

On September 26, 1980, officials of the State Education Department ("Education") met with officials of the Department of the Budget ("Budget") and recommended that annual tuition and maintenance rates for BRI be set at $53,832 per child. Education arrived at its budget recommendation after an evaluation of BRI's requested budget of $60,967 per child, submitted to Education on August 25, 1980.

Education's recommended budget was lower than BRI's request for a number of reasons. Education favored a revised staffing pattern, and limited other budgeted costs to increases of 7% over amounts budgeted for 1979–80. Although BRI does not challenge these disallowances, the Court notes that the state defendants presented no facts showing that budget costs for BRI for 1980–81 would actually be limited to increases of 7% over amounts budgeted for 1979–80. Our general experience with inflation in all fields of endeavor suggests otherwise. With these adjustments, the budget per child would be $57,604.

Education then made these three further disallowances: an amount equal to 5% of budgeted salaries was subtracted to allow for employee turnover and fringe benefits saved as a result; claimed "excessive" legal fees were disallowed; and interest on a working capital loan to BRI from Dr. Matthew Israel, the Executive Director of BRI, was also disallowed. Again, the Court notes that the state defendants presented no facts showing that BRI's claimed legal fees were "excessive."

Included in this budget recommendation by Education was a salary of $39,000 for Dr. Israel as Executive Director of BRI with a fringe benefit rate of 12.1% of salary.

---

\* These "Standards" are:

part of an Interagency Memorandum of Agreement signed by six State agencies, (Audit and Control, Division of the Budget, State Education Department, Department of Social Services, Office of Mental Health, Board of Social Welfare) in 1977 to ensure a common

Budget took exception to Education's inclusion of Dr. Israel's salary. Budget believed that the salary should be disallowed pursuant to the "Standards" \* solely because Dr. Israel is also a Director of BRI. The applicable standard states:

*Conflict of Interest*

In a not–for–profit organization, if a voting member of the governing board (Board of Directors, Trustees, etc.) receives remuneration from the school, such remuneration will be excluded from the computation of tuition rates and maintenance rates. Examples of remuneration includes salaries, consultation fees, or services provided by the school. "Member of the governing board" means the person who is on the board, any person related to that member, or any corporation, partnership or proprietorship in which the member has any interest.

Since Dr. Israel is a voting member of BRI's Board of Directors, he may not be compensated as Executive Director of BRI under this standard.

With the exclusion of Dr. Israel's salary, the rate approved by Budget was $52,410 per child. Education has recently adopted Budget's position that Dr. Israel's salary be disallowed, and therefore has agreed with Budget on the rate of $52,410 per child for the 1980–81 school year.

In an affidavit signed on September 3, 1980 and submitted to the Court Mr. Robert Ganz, an attorney for BRI, made the following statements:

Since the filing of the original motion papers on June 30, 1980 certain events have occurred which obviate the need for some of the injunctive relief prayed for, as hereinafter set forth.

\*　\*　\*　\*　\*　\*

---

and acceptable framework for various State agencies involved in the provision of or accounting for services delivered to New York State handicapped children.

Howard E. Miller, Supplemental Affidavit in Opposition to Preliminary Injunction, ¶ 17 (October 1, 1980).

The State Department of Education, on or about August 29, 1980 promulgated a per public [sic] tuition and reimbursement rate for 1980–81 in an approximate amount of $54,000. Upon information and belief, the calculation of the proposed rate did not utilize the "Standards" of which BRI complainted, and which, if approved by the Third–Party Defendant Miller, under present circumstances, is sufficient to allow BRI to meet the minimum staffing requirements and provide "appropriate education" pursuant to the requirements of state and federal law. Accordingly, Mr. Ganz withdrew portions of this motion as against the State Education Department.

In letters to the Court dated October 3, 1980 and October 16, 1980, Mr. Ganz supported a rate of $57,604 per child, and in the October 16, 1980 letter he resubmitted his motion as against Education because of Education's decision to favor disallowance of Mr. Israel's salary.

As the recital of facts indicates, the positions of BRI and Education have been less than consistent. While at one time stating that approximately $54,000 per child would be sufficient to meet minimum staffing requirements and to provide an appropriate education, BRI is now strongly supporting the $57,604 per child figure. While originally recommending that Mr. Israel's salary be included in the budget, Education has reversed itself, based on an apparent belief that the "Standards" must be followed.

These inconsistent positions and reversals of position are, of course, a normal part of the negotiating process. However, litigants may not "blow hot and cold in a lawsuit." See Beck, Estoppel Against Inconsistent Positions in Judicial Proceedings, 9 Brooklyn L.Rev. 245 (1940). Having stated in an affidavit in support of its motion for a preliminary injunction that approximately $54,000 per child would be sufficient to meet minimum staffing requirements and to provide an appropriate education, BRI cannot now claim that only a rate of $57,604 would meet these requirements and prevent irreparable injury. A showing of

irreparable injury is a requirement for the issuance of a preliminary injunction; because BRI's position in the affidavit is inconsistent with such a showing, no preliminary relief should be granted by this Court as to this claim.

BRI has also moved that Budget be enjoined from disapproving, on educationally related grounds, staff positions initially approved by Education. Since it made that initial recommendation, however, Education has determined that certain of those approved staff positions should not be included in BRI's tuition and maintenance rate. Such a determination is Education's responsibility. See New York Education Law § 4405(3)(d). Since Budget did not disapprove on educationally related grounds certain staff positions, but merely accepted Education's revised recommendations as to staffing, BRI's motion as to this issue no longer presents a controversy.

BRI also asks that Education and Budget be enjoined from using the "Standards" in setting tuition and maintenance rates. Education and Budget acknowledge that they used the standard dealing with "Conflicts of Interest," quoted supra, in setting such rates.

To be entitled to a preliminary injunction enjoining the use of the "Conflict of Interest" standard, or the "Standards" in their entirety, the parties requesting the injunction must make a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).

To meet the irreparable injury requirement the party requesting relief must show an injury that will not be adequately compensated by an award of money. 596 F.2d at 72. BRI arguably could be compensated in money for tuition and maintenance rates withheld from it by the state defendants pursuant to the "Standards"; however,

money damages awarded at the end of litigation would not compensate the plaintiff handicapped children for deficiencies in their education during the pendency of the lawsuit that were caused by the wrongful use of the "Standards." Clearly, the irreparable injury requirement has been met. Plaintiff autistic children are severely handicapped persons, in need of constant care and supervision in a residential school. All have great difficulty in learning to take care of their most basic personal needs. Their parents have searched in anguished desperation for a school suitable for their children which would teach them basic skills, such as how to dress themselves and sit through a family dinner. The parents of plaintiff children believe that at BRI their children have learned more and made greater progress toward rehabilitation than would be possible at any other school. A disruption of the children's lives, such as that which would be caused by an abrupt change of schools, would be likely so to disturb these children that many skills, acquired after time and great effort, would become unlearned and lost. Many have been transferred before; shuttled from pillar to post by an uncaring society. This Court cannot compel BRI, a private institution in another state, to remain open or to squander its substance for the benefit of New York State. Without adequate compensation, BRI may very likely close its doors entirely, or at least close them to New York students. At least during the pendency of this lawsuit, until the merits of the case are decided, such irreparable injury to the autistic children must be avoided.

The second requirement for a preliminary injunction involves a consideration of the merits of BRI's and plaintiff's claim. This Court finds that BRI and plaintiffs have shown sufficiently serious questions going to the merits and a balance of hardships tipping toward them so that they are entitled to a preliminary injunction.

BRI argues that the "Standards" were declared invalid in *Dubendorf v. New York State Education Department*, 97 Misc. 382, 412 N.Y.S.2d 260 (Sup.Ct. Monroe Co.1978). Letter from Robert E. Ganz, attorney for BRI, to the Court, at 3 (October 16, 1980). Education and Budget dispute BRI's interpretation of that case.

The *Dubendorf* court held that although defendant Ambach is required under § 4405(3)(d) to promulgate rules and regulations for the setting of tuition rates, if he fails to do so, he has the power pursuant to § 4401, quoted *supra*, to approve tuition rates without regulations.

As the foregoing indicates, the plaintiffs in *Dubendorf* did not attack a specific standard, but rather challenged the entire rate-setting procedures of the State Department of Education.

The *Dubendorf* court also held, however, that the "Standards" had no legal effect or validity under § 4405(3)(d) of New York Education Law, which states that "the commissioner of education shall, annually, determine the allowable tuition rate for each private school ... pursuant to his rules and regulations," because the "Standards" had not been promulgated and filed as required by state law. 412 N.Y.S.2d at 268–69.

That Education and Budget have bound themselves to adhere to these "Standards" without either promulgating them as rules or regulations or considering on a case-by-case basis whether they should be applied presents serious questions going to the merits: whether Education and Budget have violated New York Education Law § 4405(3)(d); whether adherence to these "Standards" conflicts with Education's responsibility under federal law, 20 U.S.C. § 1401 *et seq.*, to provide a "free appropriate public education" for all handicapped children; and whether use of the "Standards" without a case-by-case review of their applicability is arbitrary and capricious.

Third-party defendant Miller cites as the rationale behind the "Conflicts of Interest" standard the following: promotion of arm's length transactions and encouragement of an infusion of new blood into a school's Board of Directors. These unrealistic rationales do not support the application of this standard to BRI, or, probably, to many

other schools. And in all events, the corporate visitorial power resides with the state of Rhode Island, not New York.

BRI is an unusual school with a unique program, which is devoted to children with special needs. It serves students from states in New England, as well as New York students. BRI's founder and present chief executive officer, Dr. Israel, designed BRI's program based on his own scientific research and theories. He now runs the school and serves as a member of its Board of Directors. That he holds these positions appears to be appropriate and necessary for an effective administration of BRI. That Dr. Israel should be paid a reasonable salary as Executive Director of BRI also appears to be appropriate. An arbitrary determination by New York that he cannot receive compensation from this foreign corporation because he is also a member of the Board of Directors will only harm New York children who need the services of a school like BRI. It will have no countervailing benefit. These children are given the right to a free appropriate public education by federal law. In virtually every case their parents could not afford to pay tuition to schools such as BRI. It cannot be expected that BRI, an out-of-state private school, will or should acquiesce in arbitrary cost-cutting by New York, or adjust the makeup of its Board of Directors to suit some bureaucratic predilection of New York. The absurdity of any suggestion to the contrary should be readily apparent; if he would only resign as a director, his altogether reasonable salary would be brought into the budget--this even if some Charlie McCarthy were to be appointed to the Board in his place, to assure that the founder's voice will still be heard.

Further, the balance of hardships tips towards BRI and the plaintiffs. If injunctive relief is granted and BRI later loses on the merits, money can be refunded to the state. However, if preliminary relief is not granted, the quality of plaintiffs' education at BRI will be impaired.

The Court in its discretion limits the preliminary injunction in this case to enjoin the state defendants from using the "Conflict of Interest" standard in setting maintenance and tuition rates for BRI for the 1980–81 school year. BRI and plaintiffs are not precluded from arguing that the use of the "Standards" in their entirety should be permanently enjoined.

The Court further holds that third–party defendant Miller should be joined as a defendant in the main action since Miller has the authority and responsibility under New York Education Law § 4405(3)(d) to approve tuition rates for BRI.

Accordingly, the Court preliminarily enjoins defendants Ambach and Miller from using the "Conflict of Interest" standard in setting tuition and maintenance rates for BRI for the 1980–81 school year or thereafter pending trial of the action. Thus, the per pupil rate for the 1980–81 school year at BRI will be $53,832 during the pendency of the preliminary injunction. In view of the overriding public interest, no bond will be required.

The foregoing constitutes findings and conclusions in accordance with Rule 65, F.R. Civ.P.