ANDREW H., a minor, by his mother, IRENE H., Denise P., a minor, by her mother, Diane P., Becky D. and Dicky D., minors, by their mother, Jeanne D., Scott W., a minor, by his mother, Janet W., Katrina S., a minor, by her mother, Shirley S., Steven Z., a minor by his father, Leo Z., Erin G., a minor, by her mother, Candice G., on behalf of themselves and all others similarly situated, the Clear View School of the Association for Mentally Ill Children of Westchester, Inc., the Greenshire Residential School for Retarded Children, the Herbert G. Birch School Inc., the Interagency Council of Mental Retardation and Developmental Disabilities Agencies, Inc., the New York State Council of Voluntary Family and Child Care Agencies, Inc., and Organization to Assure Services for Exceptional Students, Inc., Plaintiffs,

v.

Gordon M. AMBACH, individually and as Commissioner of Education of the State of New York, and Michael Finnerty, individually and as Director of the Budget of the State of New York, Defendants.

No. 84–CV–131.

United States District Court, N.D. New York.

Dec. 31, 1984.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

Rebell & Krieger, New York City, for plaintiffs; Michael A. Rebell, Arthur R. Block, New York City, Marion C. Katzive, White Plains, N.Y., of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for defendants; Lawrence L. Doolittle, Asst. Atty. Gen., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This action arises out of a challenge to the New York State rate setting procedure for tuition reimbursement of private schools providing services to handicapped children who are unable to be placed in public school programs under the Education of the Handicapped Act ("EHA"), 20 U.S.C. §§ 1401–1461, and Article 89 of the New York State Education Law, N.Y. Educ.Law §§ 4401–4409 (McKinney 1981 & Supp.1983). The action is brought pursuant to 42 U.S.C. § 1983 and is founded upon claims that the revised rate setting procedure deprives plaintiffs of their due process and equal protection rights under the fourteenth amendment to the United States Constitution, and violates statutory protections under the EHA and section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794.[1] Jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343. Before the Court are the plaintiff children's motion for partial summary judgment on their first, second, fourth and fifth claims, and the plaintiff schools' motion for summary judgment on the ninth claim, and for partial summary judgment on the eighth claim, Fed.R.Civ.P. 56(a). In addition, defendants have moved for summary judgment with respect to those claims raised by the organizational plaintiffs, Fed.R.Civ.P. 56(b).

### II

Plaintiffs Andrew H., Denise P., Becky D., Dicky D., Scott W., Katrina S., Steven Z., and Erin G., are handicapped children under the EHA and New York law. *See* 20 U.S.C. § 1401(1); N.Y.Educ.Law § 4401.1.[2] Each child either currently attends one of

---

1. By Order dated March 22, 1984, this Court dismissed plaintiffs' pendent state law claims pursuant to the Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman,* — U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

2. Plaintiff children bring this suit as a class action, Fed.R.Civ.P. 23, claiming to represent all other handicapped children similarly situated. Plaintiffs, however, have yet to be certified pursuant to Fed.R.Civ.P. 23(c).

the private schools named as plaintiffs in this action or has not been able to be placed in a proper public or private school due to the extent of his/her handicap. Plaintiffs Clear View School, Greenshire School and Herbert G. Birch School are private schools which have been approved by the New York State Commissioner of Education to provide special educational services for handicapped children.[3] Plaintiff Interagency Council of Mental Retardation and Developmental Disabilities Agencies, Inc. ("IAC") is a not-for-profit New York corporation consisting of sixty voluntary, not-for-profit providers of services for the handicapped in New York. Plaintiff New York State Council of Voluntary Family and Child Care Agencies ("Council") is a not-for-profit New York corporation consisting of 119 non-sectarian voluntary family and child care agencies located throughout New York. Plaintiff Organization to Assure Services for Exceptional Students ("OASES") is a not-for-profit New York corporation consisting of thirty-eight private schools approved by the New York State Commissioner of Education to provide educational services to handicapped children. Defendant Gordon M. Ambach is the New York State Commissioner of Education and is charged with overseeing public education in the State, including special education. Defendant Michael Finnerty is the New York State Director of the Budget and is authorized to approve tuition reimbursement rates for private schools providing services for handicapped children after such rates have been set by the Commissioner of Education.

### A. *Statutory Framework*

The EHA "provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures." *Board of Education v. Rowley,* 458 U.S. 176, 179,

102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). The Act requires states receiving federal assistance under it to "effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). A participating state must submit for approval to the Commissioner of Education a detailed plan outlining the manner in which such educational opportunities will be provided. *Id.* § 1413. The "free appropriate public education" includes not only special education, *id.* §§ 1401(16), 1412, but also related services such as transportation, physical and occupational therapy and psychological services. *Id.* § 1401(17).

Under the EHA, each local board of education is obligated to locate and evaluate all handicapped children residing within its jurisdiction, *id.* § 1414, and to provide these children with an educational program "at the earliest practicable time." 34 C.F.R. § 104.33(d).[4] Each child's educational placement is determined on an individual basis through the development of an "individual educational program" ("IEP") which tailors the specific needs of the child to the specific program. The IEP is developed with the input of the parents, teacher and school board. When an appropriate placement in a public school cannot be located due to the special needs of the child or an unavailability of space, the EHA authorizes local school districts to contract with private institutions, approved as suitable by the Commissioner of Education, for placement of the child. 20 U.S.C. § 1413(a)(4)(B). Children placed in such private programs must be so placed "at no cost to their parents or guardian." *Id.*

Pursuant to these provisions, Article 89 of the New York State Education Law authorizes local school boards to enter into such contracts with private institutions, provided that the private institution and the specific contract are previously ap-

---

**3.** The Clear View School and the Herbert G. Birch School are located in New York State. The Greenshire School is located in Connecticut.

**4.** Under New York regulations, "at the earliest practicable time" is interpreted to require evaluation of a child within 30 days of referral, and placement of the child in an appropriate program within 60 days of referral. 8 N.Y.C.C.R. § 200.5.

proved by the Commissioner. N.Y. Educ.Law § 4402.2(b)(1). The Commissioner then is charged with the duty to develop reimbursement methodologies "for tuition and maintenance components of approved private schools." *Id.* § 4405.3(d)(i). These methodologies, developed in consultation with various agencies, are "based upon appropriate educational standards promulgated pursuant to regulations of the commissioner of education," *id.*, and are subject to the approval of the State Director of the Budget. *Id.* § 4405.3(d)(iii). Once such methodologies are approved, the Commissioner is obligated to apply them to the various approved private schools in order to determine the annual tuition reimbursement rate for each school.

## B. *The New York Rate Setting Methodologies*

Pursuant to a State legislative directive,[5] the New York State Department of Education ("Department"), prior to the commencement of the 1983–84 school year, adopted a new reimbursement system for private schools. The new reimbursement methodologies attempt to set a school's reimbursement rate by analyzing the school's actual cost history as reflected by a base year. The base year is two years prior to the year for which the current rate is being set. Depending on the individual circumstances of the school, these base year figures may be adjusted upward for inflation

or for major program changes required by law, regulation or enrollment. After such figures are established, a school's cost figures in certain cost center categories are subject to various "screens" reflecting statewide or regional averages for such costs. If a given school's cost figures are above the allowable screen, they are disallowed pending an appeal or a possible justification for the higher cost.

At least five cost screens are used by the Department in reviewing actual cost figures: an administrative cost screen, a facility and maintenance cost screen, a teacher salary cost screen, a growth rate cost screen and a total cost screen. The administrative cost screen provides that administrative costs which exceed twenty percent of the total allowable costs are disallowed, pending a possible justification. The facility and maintenance cost screen covers such items as rent, real estate taxes, utilities and interest on debt service and is computed by a formula which considers the average square footage per child in schools statewide, the enrollment of the specific school and the allowable cost per square foot calculated yearly.[6] The teacher salary cost screen prohibits an increase in teacher salaries in any given fiscal year by more than the allowable increase in personal services. The growth rate cost screen limits a school which has a per care day tuition rate

---

**5.** Section 4405 of the New York Education Law was amended in 1980 to authorize the Commissioner of Education and the Commissioner of Social Services to develop a reimbursement methodology for "both tuition and maintenance." N.Y.Educ.Law § 4405.3(d)(iii). According to plaintiffs, the legislative purpose in developing a new methodology "was to reconcile the budgetary methodologies previously used by the State Education Department in establishing tuition rates and the Department of Social Services in establishing maintenance rates for students at residential schools." Complaint, ¶ 23. The intent, however, allegedly was not "to change the basic system used to establish educational tuition nor to impose arbitrary cost ceilings on private school costs." *Id.*

Prior to this legislative action, tuition reimbursement rates in New York were set by the Department of Education on a school-by-school basis. Each winter, a school would submit a list of its actual expenditures for the current

school year and estimates of its expenses for the upcoming year. After reviewing these submissions, the Department of Education would issue a desk audit which would set the school's new reimbursement rate. At the end of the school year, the school's actual expenditures were subject to a further audit and a final rate thus was set. At no time during this procedure were statewide "averages" or specific cost category "screens" applied to a specific school. Rather, the entire process would solely reflect the individual school's cost history.

**6.** One source used by the Department in calculating the allowable cost per square foot for a given year is a United States Department of Housing and Urban Development index reflecting federal section 8 housing fair market rents. Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried at 3.

thirty to eighty percent higher than the statewide average to a zero to five and one-half percent increase for the upcoming fiscal year. The total cost screen, which is considered after all other screens, limits a school's per care day rate to a twenty percent increase from the prior year.

Each school's reimbursement rate is calculated initially by Department accountants. Upon receipt of its initial calculation of allowable tuition, a school is given thirty days to appeal the calculations to the Department. If an appropriate justification is established in the appeal, the Department may permit such costs regardless of whether they exceed the screens. A school has the right to an oral presentation on appeal.[7] Any appeal which is granted in whole or in part by the Department must be approved by the Division of Budget. No formal guidelines exist for the time frame of an appeal, but defendants state that the Department attempts to finalize all appeals by the fall of each school year.

### C. *Plaintiffs' Claims*

Plaintiff schools, children and school organizations allege that the newly revised methodologies are inconsistent with the mandate of a "free appropriate public education" under the EHA, violate the antidiscrimination provision of the Rehabilitation Act[8] and infringe upon their due process and equal protection rights under the fourteenth amendment. In moving for partial summary judgment, plaintiff schools and children challenge the procedural aspects of the implementation of the methodologies. The schools contend that the new rate making and appeals process violates their procedural due process rights by denying them the true cost of tuition for the placement of the children.[9] The children

---

7. While Department regulations require that the opportunity for an oral appeal be given to a school, no formal procedure for the presentation is outlined. The Department suggests that, as a matter of practice, such presentations "have been designed to allow the school [sic] the freedom to present their argument in a manner in which they feel best addresses the issues that need to be raised." Affidavit of Lawrence L. Doolittle in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 7.

8. Section 504 of the Rehabilitation Act provides:
No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
29 U.S.C. § 794.
The Supreme Court's recent decision in *Smith v. Robinson,* ─── U.S. ───, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), however, makes application of section 504 here questionable. In *Robinson,* the Court stated:
Even assuming that the reach of § 504 is coextensive with that of the EHA, there is no doubt that the remedies, rights, and procedures Congress set out in the EHA are the ones it intended to apply to a handicapped child's claim to a free appropriate public education. We are satisfied that Congress did not intend a handicapped child to be able to circumvent the requirements or supplement the remedies of the EHA by resort to the general antidiscrimination provision of § 504.

*Id.* at 3473.

9. Clear View School alleges that the minimum per capita reimbursement rate which would permit it to continue to operate as a service provider is $15,026. After applying the new methodologies to Clear View's submissions, the Department approved only $11,536 as the tuition reimbursement rate for Clear View for the 1983–84 school year. (This figure was later increased to $12,325 upon further submissions by the school). The net effect of this reduced rate, according to Clear View, will be to force the school to close down all services that it currently provides to handicapped children Complaint, ¶ 4A; Affidavit of Marion C. Katzive at 6.

Greenshire School alleges that, pursuant to the application of New York's new methodologies, its tuition reimbursement rate for the 1983–84 school year was reduced by $4,000 per child. The net effect of this reduced rate, according to the school, will be to force Greenshire to discharge all New York students who are currently attending the school and replace them with students from other states. Complaint, ¶ 4B.

Herbert G. Birch School alleges that the minimum per capita reimbursement rate which would permit it to meet its expenses as a service provider is $12,307. After applying the new methodologies to the school's submissions, however, the Department approved a tuition reimbursement rate of $10,975. The net effect of this reduction in the amount requested, according to the school, will be to force the school to lay off several key staff personnel. Complaint, ¶ 4C.

contend that the current review procedures deny them rights under the EHA by denying adequate funding to private institutions and thus forcing those institutions to eliminate services. According to plaintiffs, these new rates will force many private schools currently providing services for handicapped children to shut down, eliminating the placement of those children currently in private schools, and denying future placement to those children who have yet to locate placement.

The problems alleged to inhere in the implementation of the new methodologies are numerous. First, plaintiffs claim that no clear, consistent written statement that explains the manner in which the new system is to be implemented exists. Indeed, the methodologies are alleged to be based on "a melange of understanding, excerpts from different manuals and documents, and discretionary policy positions taken by individual accountants and supervisors based on their understanding of the facts of a particular case." Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment at 20. As such, the methodologies are claimed to be inconsistently applied to individual schools by Department accountants so that a given school finds it impossible to comprehend the manner in which its tuition reimbursement rate has been calculated.[10]

Second, the manner in which the Department calculates the various rates is said to be secretive, and access by the schools to the decision makers, i.e., the Department's accountants, routinely denied. Notice of how an initial rate was calculated and what may be considered on appeal allegedly is never given. Private schools, therefore, are not given a meaningful opportunity to challenge their respective rates. Plaintiffs thus categorize the overall process as "so secretive and disorganized that virtually no focus is put on the key individual justification issues the process presumably was established to emphasize." Affidavit of Marion C. Katzive at 5.

Finally, plaintiffs contend that the appeals process lacks any formal procedure and, in fact, is not a true appeals forum. Rather, the appeals process acts as a forum for further initial review of justifications for school expenditures which exceed the various screens and, thus, does not lend itself to a thorough analysis of the calculations previously made. Moreover, it is contended that notice of the specific reasons for appellate decisions, and the factual assumptions made in such appeals, are never disclosed to the specific schools, thus shielding the schools from a complete understanding of the manner in which the rate was set.

In order to align the New York procedure with due process considerations, plaintiffs suggest that, at minimum, the State be ordered to adopt a reimbursement system that provides for: (1) a clear statement of the methodologies to be applied; (2) detailed information concerning the manner in which each school's reimbursement rate was set; (3) formal notice of the appeals procedure and standards of review; (4) an opportunity for a school to appeal to the specific decisionmaker in each case; (5) notice of the policies used in the specific determinations and a thorough report concerning those items that have been denied; (6) timely processing of appeals; and (7) an opportunity for a further review before an unbiased party.[11]

---

**10.** According to plaintiffs, a substantial portion of this confusion stems from the fact that the prior rate setting system in New York was premised upon a schedule of allowable costs set forth in a booklet entitled "Reimbursement Cost Manual." When the new methodologies were implemented and the various screens were imposed, it became extremely difficult, if not impossible, for a school to determine how the tables of allowable costs would interweave with the screens. In sum, schools allegedly cannot

"decipher or ... predict, in advance, how a specific rate will be calculated." Supplemental Affidavit of Michael A. Rebell at 5.

**11.** Plaintiffs set forth, as exhibits 1, 1–A & 1–B to their moving papers, a proposed procedure for appellate review of the initial rate calculations, and request that this Court implement such a procedure as an alternative to the present structure. While the proposed procedure appears to have merit and to be quite

Defendants also move for summary judgment as to the organizational plaintiffs. Under the Second Circuit's narrow rule for standing in § 1983 actions, they contend that IAC, OASES and the Council lack the requisite injury or representational capacity to bring this action. The crux of defendants' argument is that, since the organizational plaintiffs do not contract with school districts and thus provide no services under the EHA or New York law, any determination relating to them would constitute solely an advisory opinion.

### III

#### A. *Standing of the Organizations*

In *League of Women Voters v. Nassau County Board of Supervisors*, 737 F.2d 155 (2d Cir.1984), the Second Circuit held that organizational standing should be narrowly construed in actions brought pursuant to 42 U.S.C. § 1983. 737 F.2d at 160. *League of Women Voters* involved an organization's challenge, on behalf of its members, to the reapportionment of the Nassau County weighted vote system as violative of the equal protection clause of the fourteenth amendment. In denying the organizational plaintiffs standing, the court noted that "[t]his Circuit has restricted organizational standing under § 1983 by interpreting the rights it secures to be personal to those purportedly injured." *Id.* at 160; *accord Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974) ("Neither [the] language nor the history ... [of § 1983] suggests that an organization may sue under the Civil Rights Act for the violations of rights of members.").

In applying this analysis here, defendants correctly point out that the organizational plaintiffs do not provide services directly to handicapped children under the EHA and have not entered into contracts with the State for the provision of services to such children. No tuition reimbursement rates, therefore, are set for these

plaintiffs. Given no more facts than these, IAC, the Council and OASES appear to lack the personal stake required in this circuit for such claims.

Plaintiffs, however, assert standing on four separate grounds. First, they contend that the new rate setting methodologies will have a direct pecuniary effect on them. Courts have established that an organization has standing when it is claiming injury to itself. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."); *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."). Such personal injury has been extended to encompass injury to the associational ties of members. *Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. at 2211; *Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319, 1321–22 (2d Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). In the present case, since the operating budgets of the organizations are directly dependent upon the dues received from their members, any impediment placed upon the funding of their members theoretically will have a direct effect on plaintiff organizations' ability to collect funds needed for their continued existence.

Second, plaintiffs argue that, even absent injury to the organizations themselves, standing may be premised upon the organizations' capacities as representatives of their members. An organization may bring a representational action if its members would otherwise have standing to bring the action, the interests sought to be protected are germane to the purpose of the organization and the claim and relief

innovative, for the reasons provided herein the
Court declines to mandate such a revision.

requested do not require the participation of the individual members. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The Supreme Court, in *Warth v. Seldin*, stated:

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members.... The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.... So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

422 U.S. at 511, 95 S.Ct. at 2211. Given that the three organizations in the present case have as their purpose the assistance and support of their members, and such members allegedly have approved the participation of IAC, the Council and OASES in this action, plaintiffs suggest that they fall within the *Warth* and *Hunt* criteria.

Third, plaintiffs contend that the allowance of organizational standing in this action will serve the interests of judicial economy. Specifically, if the organizations are denied standing, a number of member schools and agencies will have to attempt to intervene in the present litigation in order to protect their respective interests. By permitting the organizations to continue, therefore, court time and expense theoretically are spared.

Finally, plaintiffs attempt to distinguish *League of Women Voters* from the present action by pointing out that that case dealt solely with claims arising under 42 U.S.C. § 1983. The present action, while includ-

ing claims arising under § 1983, is said to involve primarily claims under the EHA and the Rehabilitation Act. According to plaintiffs, the limited analysis in *League of Women Voters*, therefore, should not be extended beyond its limited scope.

■ While a number of plaintiffs' contentions on their face have merit, this Court is constrained to follow the analysis of *League of Women Voters* and deny standing to the three organizations for a number of reasons. First, the only statement of specific organization-related injury in the complaint alleges that "[e]ach of the members of the organization has been detrimentally affected by the arbitrary rate making procedures and/or other unreasonable regulatory actions complained of herein." Complaint, ¶ 5C; *see id.* ¶¶ 5A, 5B. No allegations are made relating to pecuniary loss to the organizations themselves. While allegations of such loss are made in affidavits submitted in opposition to defendants' motion, no factual data have been presented that would suggest that the organizations' treasuries actually will be drained by the effect of the rate setting methodologies on member schools.

Similarly, the representational argument under *Warth* and *Hunt* must also fall.[12] Although the complaint and supporting affidavits state that member schools are being injured by application of the new methodologies, no facts concerning the specific member schools have yet to be uncovered that would lead this Court to give credence to this conclusion. To date, specific factual allegations have been made solely on behalf of the three schools named as parties in the complaint. No other similar factual allegations are set forth concerning the members of the organizations. Considering that this motion is one for summary judgment and significant discovery has already occurred, this Court finds it inappropriate to give plaintiffs a further opportuni-

---

**12.** It also should be noted that the allegations in *Hunt* were premised not upon 42 U.S.C. § 1983, a statutory provision which this circuit has interpreted narrowly for standing purposes, but rather upon violations of the interstate commerce clause. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 336, 97 S.Ct. 2434, 2438, 53 L.Ed.2d 383 (1977).

ty for such a showing. Recently, Judge Telesca applied a similar analysis in denying standing to the Sierra Club in an action against a corporation for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1365. *Sierra Club v. SCM Corp.,* 580 F.Supp. 862 (W.D.N.Y.), *aff'd,* 747 F.2d 99 (2d Cir.1984). In the context of *a motion to dismiss,* the Court stated:

> It is critical to point out that plaintiff has failed to show that any particular member of its organization has or may be adversely affected in any specific way by defendant's actions. . . . Plaintiff would have this Court presume *some* injury to *some* of its members without providing the necessary factual basis in support of such a theory. Injury cannot be presumed from such conclusory allegations—more is required.

*Id.* at 865–66 (emphasis in original). Certainly, more is required of plaintiffs here than undocumented allegations.

▇▇▇ Plaintiffs' contentions relating to judicial economy and to the inapplicability of § 1983 standing analysis also are unpersuasive. While judicial economy certainly is a factor to be considered in any analysis, the Court does not adhere to the view that such an interest outweighs the necessity of establishing an adequate factual suggestion of injury. If specific member schools can present factual allegations of injury due to the rate setting methodologies, nothing prevents such schools from attempting to intervene in this action to protect whatever interests they consider at risk. Moreover, while *League of Women Voters* is limited to § 1983 actions, the Court finds inapplicable to these plaintiffs the distinction drawn between such claims and claims arising under the EHA and the Rehabilitation Act. Nothing in the EHA or Rehabilitation Act grants to such organizations a private right of action. The organizations derive no rights or privileges from the federal statutes. Rather, the EHA and the Rehabilitation Act impart rights, potentially litigable in federal court, to the children the provisions attempt to assist. Any rights of the organizations, therefore, must be derived via § 1983 for alleged violations of various constitutional rights. In sum, the Court holds that the organizational plaintiffs lack the requisite standing to maintain this action.

### B. *The Due Process Rights of the Schools*

Plaintiffs Clear View School, Greenshire School and Herbert G. Birch School move for summary judgment on the ninth claim in the complaint and for partial summary judgment on the eighth claim alleging that the manner in which the new rate setting methodologies are implemented violates their procedural due process rights. The Supreme Court, in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), established a three-pronged analysis for determining what process is due prior to a deprivation in an administrative setting. A court must examine the interest affected, the risk of erroneous deprivation under the present procedures and the government interest involved. *Id.* at 335, 96 S.Ct. at 903. Before such an inquiry, however, a plaintiff must establish the existence of a constitutionally protected property interest. *Oberlander v. Perales,* 740 F.2d 116, 120 (2d Cir.1984). Such property interests are not established by constitutional mandate, but rather are created by "independent source[s] such as state law." *Id.* at 120; *accord Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Plaintiffs allege that § 401.5 of the New York Education Law, which defines "tuition" to include "the per pupil cost of all instructional services, supplies and equipment, the operation of instructional facilities and allocable debt service," N.Y.Educ. Law § 4401.5, bestows upon them a constitutionally protected property right for reimbursement of the full cost of tuition. Alternatively, plaintiffs contend that they have a legitimate expectation of continued participation as a service provider under the EHA and Article 89 of the New York Education Law and therefore have a constitutionally protected interest in such continued participation. *See Perry v. Sinder-*

*mann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

Plaintiffs allege a second due process theory based upon the Second Circuit's landmark decision in *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2nd Cir.1968). In *Holmes*, low income public housing applicants contended that the Housing Authority's system for selecting among applicants for available public housing "increase[d] the likelihood of favoritism, partiality, and arbitrariness on the part of the Authority, and deprive[d] the plaintiffs of a fair opportunity to petition for admission to public housing, and to obtain review of any action taken by the Authority." *Id.* at 264. In denying the Housing Authority's motion to dismiss, the court noted that "[i]t hardly need be said that the existence of an *absolute and uncontrolled discretion* in an agency of government vested with the administration of a vast program, such as public housing, would be an intolerable invitation to abuse." *Id.* at 265 (emphasis added). At least one court has applied such an analysis to a rate setting agency. *Northern California Power Agency v. Morton*, 396 F.Supp. 1187 (D.D.C.1975), *aff'd*, 539 F.2d 243 (D.C.Cir.1976). In essence, therefore, plaintiffs allege that the lack of a specific written methodology and the presence of an informal and inconsistent appeals process under the New York system constitute a "never-never land of bureaucratic inconsistencies" and thus violate the substantive requirements of due process as set forth in *Holmes*. Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment at 20.

██ In examining the New York law pertinent to the existence of a property interest for full tuition reimbursement, the Court finds that no such constitutional right exists in the present case. Initially, it must be noted that, on its face, § 4401.5 of the Education Law does not give private schools carte blanche in determining their respective tuition rates. Rather, "per pupil cost" is limited to the costs of various services "*as determined by the commis-*

*sioner.*" N.Y.Educ. Law § 4401.5 (emphasis added). New York case law has interpreted this language, in conjunction with § 4405, which authorizes the Commissioner to set the various school reimbursement rates, N.Y.Educ. Law § 4405.3(e), to empower the Commissioner to determine the reimbursement rate "with respect to 'allowable' costs." *Organization to Assure Services for Exceptional Students, Inc. v. Ambach*, 82 A.D.2d 993, 994, 440 N.Y.S.2d 390, 393 (3d Dep't 1981), *modified on other grounds*, 56 N.Y.2d 518, 449 N.Y.S.2d 952 (1982). Thus, the term "full tuition" must be interpreted in light of the Commissioner's statutory authority to ascertain the "allowable tuition." As such, plaintiff schools cannot be said to have an interest greater than what the statutory provisions authorize.

More important, the Second Circuit, in *Oberlander v. Perales*, 740 F.2d 116 (2d Cir.1984), recently examined the issue of property interests in the rate setting context under New York law. In reviewing New York State's reduction of the daily per patient reimbursement rate for a health care provider under Medicaid, the court interpreted New York law to give Medicaid providers no property interest in future reimbursements. *Id.* at 120; *Hurlbut v. Whalen*, 58 A.D.2d 311, 317, 396 N.Y.S.2d 518, 523 (4th Dep't 1977) (citing *Sigety v. Ingraham*, 29 N.Y.2d 110, 115–16, 324 N.Y.S.2d 10, 13–14, 272 N.E.2d 524, 526–527 (1971)). In order for a property interest to exist, services must have previously been rendered pursuant to a "duly promulgated reimbursement rate." *Oberlander v. Perales*, 740 F.2d at 120; *In re White Plains Nursing Home v. Whalen*, 53 A.D.2d 926, 927, 385 N.Y.S.2d 392, 394 (3d Dep't 1976), *aff'd*, 42 N.Y.2d 838, 397 N.Y.S.2d 378, 366 N.E.2d 79 (1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1244, 55 L.Ed.2d 768 (1978). This distinction between a rate set for an upcoming period and retroactive rate reduction requiring recoupment of overpaid funds has been applied to Article 89 of the Education Law in determining whether a constitutionally protected property interest exists in the reimbursement of tuition ex-

penses. *See Dubendorf v. New York State Education Department,* 97 Misc.2d 382, 397–98, 412 N.Y.S.2d 260, 270–71 (Sup.Ct. Monroe Cty.1978), *modified on other grounds,* 71 A.D.2d 837, 418 N.Y.S.2d 834 (4th Dep't 1979).

Clearly, under *Oberlander,* no such property interest may be found in the present situation. The reimbursement rates for each school under the new procedures are set at the commencement of the school year. At that point, it is for each private school to choose whether such a reimbursement rate is acceptable for the school's further participation under its various contracts with the local school boards. The rate setting procedure which each school is required to pursue is prospective in nature since the rates are set for the upcoming school year. Thus, § 4401.5 cannot be read to create a property right for a constitutional challenge to the setting of a future rate.

■ The Court also rejects plaintiffs' position with respect to the existence of a property right based upon an expectation of continued participation as a service provider. While the effect of the new methodologies in certain situations has been to approve tuition rates lower than the figures requested, the rate setting procedure in no way prohibits or inhibits plaintiffs' continued status as approved providers of services under Article 89. Regardless of the amounts requested by the schools and the amounts approved by the Commissioner, no allegations are made that the schools are being denied *the right* to continue to accept children under the programs, albeit at a lower tuition rate. In each case cited by plaintiffs in support of an expectation interest, the parties involved were actually prohibited from continuing their involvement in the specific activity even though statutory prerequisites for such participation had been satisfied. *E.g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (teacher denied tenure); *Charry v. Hall,* 709 F.2d 139 (2d Cir.1983) (applicant meeting statutory requirements denied right to take examination for professional status as a psychologist); *Case v. Weinberger,* 523 F.2d 602 (2d Cir.1975) (plaintiff denied right to continue as a provider of health services under Medicaid). No such prohibition is apparent here. Consequently, no property interest is created.[13]

Even assuming that a constitutionally protected interest does in fact exist pursuant to statute or expectation, the Court notes that such an interest would not be compelling. Taking plaintiffs' allegations as true, the schools are not faced with a complete termination of public funds. Rather, at worst, they are faced with a reduced tuition rate for the school year. More important, these plaintiffs are not the intended beneficiaries of the programs in-

---

**13.** The Second Circuit, in *New York State Association For Retarded Children v. Carey,* 727 F.2d 240 (2d Cir.1984), recently rejected a challenge by the United Cerebral Palsy Associations of New York ("UCP") to the sufficiency of reimbursement rates for Medicaid providers in New York State. The court held that UCP's challenge to reimbursement rates which were previously set constituted an action against New York State for a prior debt and thus was barred by the eleventh amendment. *Id.* at 243. The court further held that "UCP's right to be paid is contractual only," *id.* at 245, and therefore the court abstained from determining the level of adequacy for prospective reimbursement rates since such contractual matters fall within the jurisdiction of State authorities. *Id.* The court noted:

UCP seeks review of the reimbursement rates it has received not pursuant to any federal statute or the consent judgment, but pursuant to its contract with the State. New York has established a procedure for administrative review of the rate making process, ... and judicial review of administrative decisions is available in New York Supreme Court under Article 78 of New York Civil Practice Law and Rules.... Thus, the principles of comity that compelled abstention in *Alabama Public Service Commission v. Southern Railway Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), and *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), apply to this case, and the district court properly abstained, so that UCP's claims could be decided within New York's system of review.

*Id.* While the Court finds it unnecessary to classify the rights in the present case as "contractual," *Carey* nonetheless provides support for the view that no constitutional right is implicated in the rate setting procedures under Article 89 of the New York Education Law.

volved, but rather are merely providers of such services under the programs. The *Oberlander* court, in discussing the interest, pursuant to a duly promulgated reimbursement rate, of a health care provider under Medicaid, noted:

> Flatbush Manor's interest in the money that is subject to recoupment is significantly less compelling than the private interests involved in *Mathews* (no hearing required before interim termination of disability benefits) and *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (hearing required before termination of welfare benefits). In both *Mathews* and *Goldberg* the private parties faced complete termination of the income stream at issue. In the instant case, the Bureau merely imposed a set-off against future reimbursements. In addition, in both *Mathews* and *Goldberg*, the private parties were the direct and intended beneficiaries of the program in question. Here, by contrast, Flatbush Manor is a provider and thus only an incidental beneficiary of the Medicaid program.

*Oberlander v. Perales*, 740 F.2d at 121.

Plaintiffs' sole response to the circuit's decision in *Oberlander* is to claim that Medicaid cases are inapplicable. According to plaintiffs, because "the EHA requires the provision of mandated educational services for handicapped children, without regard to any cost ceilings or constraints," *Oberlander*, which deals with a program with accepted cost constraints, is inconsequential. Supplemental Affidavit of Michael A. Rebell at 10. This position, however, is unpersuasive. First, plaintiff schools do not bring this motion for a declaration of *their* rights under the *EHA*. They do not claim that the procedures under which the reimbursement rates are set violate *their* rights under the statute.

Rather, the motion *as to the schools* is brought solely with respect to due process violations which allegedly exist. Thus, New York law, which limits the rights of organizations attempting to obtain reimbursement for services provided, is applicable. More important, although it has been held that states must provide handicapped children services mandated under the EHA without regard to the financial burden involved, *Kruelle v. New Castle County School District*, 642 F.2d 687, 695–96 (3d Cir.1981), the Second Circuit has rejected "as too broad" an interpretation of this mandate under the EHA to include the setting of tuition reimbursement rates. *Fallis v. Ambach*, 710 F.2d 49, 55 (2d Cir. 1983). Accordingly, the Court finds no procedural due process violation.

Similar analysis leads this Court to reject the application of the *Holmes* doctrine to the present facts. First, the only case to date applying this analysis to a rate setting procedure involved a concession by defendants that a statutory property interest existed. *Northern California Power Agency v. Morton*, 396 F.Supp. 1187, 1192 (D.D.C.1975), *aff'd*, 539 F.2d 243 (D.C.Cir.1976). No such concession is made in the present case and, in fact, this Court finds that no such interest exists under New York law. More important, as a factual matter, *Holmes* dealt with a situation where an agency had adopted absolutely no standards for the review of applicants for public housing. *Holmes v. New York City Housing Authority*, 398 F.2d at 264. After a careful review of the information presented in this motion, the Court concludes that the New York procedures, as imprecise as they may be, do not approach the level of "no ascertainable standard" criticized in *Holmes*.[14]

■ The mere fact that no one document thoroughly analyzes or presents the

---

**14.** While plaintiffs allege that no ascertainable standard exists under the current methodologies and, as a result of this, the standards are inconsistently and arbitrarily applied, the only factual substantiation of these allegations deals with the effect of the methodologies on one private school, the Clear View School. As a factual matter, this Court could not hold that the current methodologies procedurally are flawed merely on a review of the manner in which Clear View School's reimbursement rate was set—a rate which may be reviewed in the New York courts in an Article 78 proceeding.

new methodologies does not constitute a denial of due process. *See Baker v. Cincinnati Metropolitan Housing Authority,* 490 F.Supp. 520, 530 (S.D.Ohio 1980), *aff'd,* 675 F.2d 836 (6th Cir.1982); *Calabi v. Malloy,* 438 F.Supp. 1165 (D.Vt.1977), *modified on other grounds,* 468 F.Supp. 76 (D.Vt. 1978). Rather, due process is satisfied when an agency adopts an informal policy and applies such a policy in a relatively consistent manner. *Baker v. Cincinnati Metropolitan Housing Authority,* 490 F.Supp. at 530. Factually, plaintiff schools were made aware of the application of cost screens to otherwise reimbursable costs and the procedures to be followed on an appeal in letters sent from the Department prior to the commencement of the school year. Exhibit A to Affidavit of Lawrence L. Doolittle. In addition, several conferences were held by the Department throughout the state, at the request of the schools, where the procedures for such new methodologies were explained. Exhibit B to Affidavit of Lawrence L. Doolittle. Upon receipt of its initial rate calculation, the school is presented with all the figures used for computing its rate. Exhibit E to Affidavit of Lawrence L. Doolittle. More important, each school is given an absolute right to appeal any aspect of its rate calculation and to give an oral presentation to the Department in support of its appeal— an appeal in which, according to regulation, the Department must respond to each objection that the school may raise. Exhibits A & F to Affidavit of Lawrence L. Doolittle. Given plaintiffs' concession that, upon a school's proper justification on appeal, the Department will alter the initial rate, this Court does not find the Department's rate setting system to be so inconsistent and arbitrary that it rises to the level of a constitutional violation.[15]

The fact that the Department views each school's rate "on an individual basis" in reviewing the application of the methodologies and screens does not appear to this Court to be the equivalent of the "uncontrolled discretion" discussed in *Holmes. See Harris v. Lukhard,* 733 F.2d 1075, 1080 (4th Cir.1984). The *Holmes* analysis is predicated on the assumption that some limitation must exist to prevent an administrative agency from obtaining "uncontrolled discretion." *Holmes v. New York City Housing Authority,* 398 F.2d at 265. The allegation in *Holmes* was that the manner in which applicants were secretly selected favored some applicants over others and did not provide unsuccessful applicants an opportunity to discover their ineligibility, thereby depriving them of the chance to seek review of the Housing Authority's determination in an Article 78 proceeding. *Id.* at 265 n. 4. Here, no such denial of access to a review of the Commissioner's determination is or can be alleged. An Article 78 proceeding is available to any private school wishing to have its reimbursement rate, as promulgated by the Department, reviewed. *See* N.Y.Civ. Prac.Law § 7803 (McKinney 1981). Such a review should prevent any "uncontrolled discretion" in a given situation. *See Oberlander v. Perales,* 740 F.2d at 120 (Article 78 proceeding provides appellant with a meaningful opportunity to be heard). While this Court recognizes that an Article 78 proceeding is not an appropriate forum for challenging the Department's entire procedure for rate setting under Article 89, *Solnick v. Whalen,* 49 N.Y.2d 224, 231, 425 N.Y.S.2d 68, 73, 401 N.E.2d 190, 195 (1980), it is at least noteworthy that each school may challenge its specific rate on the ground that it was arbitrarily set—a remedy apparently not available in the *Holmes* case. *See New York State Association for Retarded Children v. Carey,* 727 F.2d 240, 245 (2d Cir.1984).

---

**15.** Furthermore, the cases cited by plaintiffs in support of the *Holmes* doctrine all deal with situations where a plaintiff was completely denied benefits as a result of the lack of existing standards. *E.g., White v. Roughton,* 530 F.2d 750 (7th Cir.1976) (plaintiff denied welfare due to the lack of proper standard); *Hornsby v. Allen,* 326 F.2d 605 (5th Cir.1964) (plaintiff denied liquor license due to lack of proper standard); *United States v. Atkins,* 323 F.2d 733 (5th Cir.1963) (citizens denied right to vote due to lack of proper standard). As discussed herein, such is not the case under the present facts.

In light of the absence of a protected property interest and the availability of an appeals process, the Court finds that no due process violation exists, and thus, plaintiff schools' motion is denied and their claims as to the procedural aspects of the reimbursement system are dismissed.

### C. The Statutory Rights of the Children

Plaintiff children move for partial summary judgment on the first, second, fourth and fifth claims in the complaint insofar as those claims allege that the State's reimbursement system infringes upon their rights to a free appropriate public education under the EHA. Specifically, plaintiffs contend that the new methodologies, which at times authorize a lower tuition rate than that requested by the schools, will force numerous private schools to shut down or eliminate placements for New York children. This, in turn, may cause the displacement of children already attending private schools and deny to those handicapped children not yet placed in a program the ability to locate a proper placement.

The legislative history of the EHA suggests that the cost of meeting the special needs of the handicapped child should not act as a financial prohibition, not otherwise applicable to the "normal child," to the provision of services. S.Rep. No. 168, 94th Cong., 1st Sess. 23, *reprinted in* 1975 U.S. Code Cong. & Ad.News 1425, 1447. The Senate Report states:

"If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system, then the available funds must be expended equitably in such a manner that no child is entirely excluded from a publicly-supported education consistent with his needs and ability to benefit therefrom. The inadequacies of [the school system], whether occasioned by insufficient funding or administrative inefficiency, certainly cannot be permitted to bear more heavily on the 'exceptional' or handicapped child than on the normal child."

*Id.* (emphasis omitted) (quoting *Mills v. Board of Education*, 348 F.Supp. 866, 876 (D.D.C.1972)). Courts routinely have interpreted this language to prohibit the denial of needed special services, required to provide a specific child with an opportunity for a free appropriate public education, on a cost basis alone. *E.g., Crawford v. Pittman*, 708 F.2d 1028 (5th Cir.1983); *Kruelle v. New Castle County School District*, 642 F.2d 687 (3d Cir.1981); *see Irving Independent School District v. Tatro*, ─ U.S. ──, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984).

In addition, when presented with situations where the manner in which a state provides educational services to handicapped children improperly or arbitrarily limits such services without provision for individualized attention and review, courts have not hesitated to grant broad injunctive relief striking down such procedures or reshaping them to conform with the EHA. *E.g., Battle v. Pennsylvania*, 629 F.2d 269 (3d Cir.1980) (Pennsylvania's inflexible policy limiting school years to 180 days for handicapped children violates children's rights under the EHA), *cert. denied*, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981); *Yaris v. Special School District of St. Louis County*, 558 F.Supp. 545 (E.D. Mo.1983) (same). The Second Circuit, in *Jose P. v. Ambach*, 669 F.2d 865 (2d Cir. 1982), expressly permitted broad challenges to a state's procedure for the placement of handicapped children. In *Jose P.*, plaintiff children brought a class action alleging that the specific procedure by which New York evaluated and placed handicapped children was deficient in respect of time considerations, in violation of their rights under the EHA. The district court determined that the New York procedures did not comply with EHA requirements and appointed a special master to formulate an appropriate revision. The circuit, in reviewing the certification of plaintiffs' class, affirmed the right of the children to bring such an action by stating that they should not be "relegated to state procedures the

inefficiency of which in part prompted their section 1983 action." *Id.* at 870.[16]

While this Court recognizes the right of a child, or group of children, to bring an action directly to federal court in order to protect rights to a free appropriate public education when pursuit of state administrative remedies would be futile, *see id.* at 869–70; *Riley v. Ambach,* 668 F.2d 635, 641 (2d Cir.1981), this Court is constrained to find such rights not implicated here. Initially, it must be noted that "[t]here are limits to the intensely discretionary responses judges may make to demands for remedial orders." P. Cooper, *Pressure Point: A Comparative Case Analysis of Federal District Court Equitable Decrees* at 36 (1984). As one commentator has stated:

> In addressing the permissible scope of a remedial order, the Supreme Court has recognized the need for breadth, but it has also reminded trial courts in several decisions that they must give due consideration to the interests of states and localities in controlling their own land use policy, schools, and public institutions over which local control has traditionally been exercised. The Court has been increasingly critical about the issuance of remedial orders which cover more than those political jurisdictions specifically implicated in illegal conduct.

*Id.* at 37. In applying these limitations to the development of educational policy under the EHA, the Supreme Court, in *Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), stated that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Id.* at 207, 102 S.Ct. at 3051. The Court noted:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.... The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [EHA] to state and local educational agencies in cooperation with the parents or guardian of the child.

*Id.* at 206–07, 102 S.Ct. at 3051.

This limitation on court review has been applied to matters of budgetary consideration. *See Battle v. Pennsylvania,* 629 F.2d 269, 278 (3d Cir.1980) ("We believe that these hard decisions of resource allocation, like the determinations of educational policy are best left to the states, in the first instance."), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). In fact, the Second Circuit has applied such a limitation in analyzing the effect of a school's tuition reimbursement rate on a child's right to a free appropriate public education. *Fallis v. Ambach,* 710 F.2d 49 (2d Cir. 1983). In *Fallis,* plaintiff children and private school brought an action for injunctive relief challenging New York's setting of the school's tuition reimbursement rate as infringing upon the children's rights under the EHA. As with the present case, the private school in *Fallis* had been given a reimbursement rate for the upcoming school year at a level substantially lower than it had requested. The children contended that if the State did not approve the requested rate, the school would be forced to shut down, effectively eliminating the

---

**16.** The circuit's decision in *Jose P.* does not directly stand for the proposition that a private right of action exists under the EHA for children to challenge the placement formulae of a state. Rather, the decision merely reaffirms the well established doctrine that "exhaustion of state administrative remedies prior to adjudication of a section 1983 claim in federal court is not required if adequate and speedy state remedies are not available." *Jose P. v. Ambach,* 669 F.2d at 869. There is, however, inferential support for such a right. The court stated that "because plaintiffs never asserted jurisdiction under section 1415(e)(2), the extent to which the EHA imposes an exhaustion requirement is irrelevant." *Id.* at 868 n. 1. In addition, upon a later motion to the district court for modification of its earlier order, Judge Nickerson expressly held that such a right of action for broad injunctive relief in fact does exist. *Jose P. v. Ambach,* 557 F.Supp. 1230 (E.D.N.Y.1983).

placement of numerous children then attending the school, thus, violating their rights to a free appropriate public education. In denying plaintiffs' request for preliminary injunctive relief, the court expressly rejected the view that tuition reimbursement is related to the right of a free appropriate public education. *Id.* at 55. "Such a bald interpretation could lead to inordinate and protracted litigation over matters within the ambit of responsibility of the state agencies to which such budgetary decisions are entrusted." *Id.* The court, therefore, labeled plaintiffs' claims as "premature" and held that a child had no right to a specific funding level for the school which he attends:

> [W]e are concerned here with the question of whether the State has an obligation to provide a certain funding level to an entire school to keep the school available as the placement for the appellant children .... [W]e conclude that Congress did not intend section 1415 to apply so broadly.... A review of the legislative history of section 1415 supports the view that the procedural safeguards were established in an effort to prevent misclassification of individual children, and not to provide a broad avenue for challenging state fiscal decisions.

*Id.*

In light of the general limitation on judicial intervention in substantive educational matters and the circuit's determination in *Fallis,* this Court finds it inappropriate to overturn New York's tuition reimburse-ment procedures on the basis of the EHA's mandate of a free appropriate public education.[17]

In earlier argument before this Court, plaintiffs attempted to distinguish the holding in *Fallis* from the present case in two ways. First, in *Fallis* plaintiffs merely were challenging the reimbursement rate given to a specific private school. The allegations of mass displacement, therefore, could not be supported since there was no proof that the children could not find an appropriate alternative placement. In the present case, however, plaintiffs contend that the entire reimbursement procedure as it is applied to all private schools will cause a number of schools to eliminate services. Thus, according to plaintiffs, there can be no question as to the certain displacement of potentially numerous children. Second, and more important, plaintiffs point out that the *Fallis* decision deals solely with actions brought pursuant to § 1415 of the EHA, the provision which establishes procedures for individual appeals and review of a particular child's placement. While tuition reimbursement rates may not be reviewable under a § 1415 proceeding, which deals solely with problems relating to a specific child, plaintiffs contend that the private right of action under the EHA, established in *Jose P.,* which permits a class action to challenge broad regulatory standards that infringe upon statutory rights, effectively extends the scope of review beyond that which is permitted under § 1415.

---

**17.** Because this Court rules herein that plaintiff children's claims under the EHA are premature, it is not necessary to address defendants' contention that the children must first exhaust their administrative remedies prior to a federal court challenge of their placement, or lack thereof. However, it should be noted that the Supreme Court, in *Smith v. Robinson,* — U.S. ——, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), recently narrowed a child's ability to bring an action in federal court prior to exhausting his administrative remedies. The Court stated:

> We have little difficulty concluding that Congress intended the EHA to be the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education. The EHA is a com-

prehensive scheme set up by Congress to aid the States in complying with their constitutional obligations to provide public education for handicapped children. Both the provisions of the statute and its legislative history indicate that Congress intended handicapped children with constitutional claims to a free appropriate public education to pursue those claims through the carefully tailored administrative and judicial mechanism set out in the statute.

*Id.* at 3468. The Court, however, appeared to reaffirm the principle in *Jose P.* that injunctive relief may be granted when pursuit of administrative remedies would be futile. *Id.* at 3470 n. 17.

■ Upon review of *Fallis* and *Jose P.*, however, the Court concludes that these distinctions have no merit. Initially, the Court notes that plaintiffs have yet to set forth facts which establish that any children actually have been displaced due to the new procedures for setting reimbursement rates. While obviously the three schools named in the complaint strongly suggest that they may close or deny entrance to New York children in the future, no displacement has yet been shown. Moreover, it has not been established that those children named in the complaint who have not yet located proper placement have been put in this position due to the new rate structure. Rather, according to the allegations in the complaint, these children have been unable to locate placement to date due to the extent of their handicaps—a problem not likely to be rectified even if the Court were to grant injunctive relief. Thus, the Court finds no real distinction between the premature nature of the claims in *Fallis* and the premature nature of the claims in the present case. Furthermore, while it is true that factually *Fallis* dealt solely with the reimbursement rate of one school, the circuit's language rejecting the relationship between reimbursement rates and a child's rights under the EHA is not so limited. A blanket statement is made that such an interpretation would extend litigation concerning the rights guaranteed under the EHA beyond reasonable boundaries, permitting state budgetary decisions to be routinely questioned.

Finally, while *Fallis* did relate to a claim brought pursuant to § 1415 and not to the private right of action under the EHA, this Court declines to find such a distinction dispositive. Factually, *Jose P.* dealt with a challenge to the New York procedures for the *evaluation* and *placement* of handicapped children. While the EHA requires the states to adopt a regulatory procedure that would place children "at the earliest practicable time," 34 C.F.R. § 104.33(d), New York's procedure, at that time, was completely ineffective in meeting this requirement. Under New York procedures, handicapped children were placed in the unfortunate position of having to be evaluated through a placement procedure that simply did not lend itself to effective placement of a large number of children. Thus, the basic purpose of the EHA, the evaluation of the individual child and the prompt placement of that child in a program conforming to his IEP, uniformily was ignored. In the present case, however, no challenge is made to the procedures dictating the evaluation and placement of handicapped children. At best, the challenge is to a reimbursement system which may have an effect on specific schools that currently provide services to handicapped children. This is not the same as a challenge to the procedures by which a state evaluates and places a handicapped child. *Cf. M.R. v. Milwaukee Public Schools*, 584 F.Supp. 767 (E.D.Wis.1984) (Jose P. distinguished by limiting its scope to the specific problems alleged therein). To hold otherwise, would be to extend the private right of action discussed in *Jose P.* beyond the realm of reviewing placement procedures and into the realm of reviewing state budgetary procedures, an avenue which in this Court's view is foreclosed by *Fallis* and any reasonable interpretation of the EHA. Therefore, in light of the clear limitations on judicial intervention into matters of administrative concern and the clear distinction in this circuit between tuition reimbursement rates and rights granted by the EHA, this Court holds that the children have not established an adequate claim under the EHA, and thus, plaintiffs' motion must be denied.[18]

---

**18.** While this Court holds that the children's claims are premature, it does not address the issue whether plaintiffs will have remedies available to them if financial circumstances in fact force a school to shut down prior to the designation of an alternative placement for the children now attending the school. *See Fallis v. Ambach*, 710 F.2d at 56 n. 11. Under such circumstances, remedies may very well be available. *See Vander Malle v. Ambach*, 673 F.2d 49 (2d Cir.1982).

## IV

Given the lack of a constitutionally protected interest in the tuition reimbursement rate of a school under Article 89 of the New York Education Law and the premature nature of the claims brought pursuant to the EHA, plaintiff schools' and children's motion for partial summary judgment is denied and their claims are dismissed as to the procedural aspects of the new reimbursement system. Furthermore, because facts sufficient to establish an injury to the organizational plaintiffs have not been alleged, defendants' motion for summary judgment on the complaint as it relates to such plaintiffs is granted and the complaint is dismissed as to them.

It is so Ordered.